## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **JOHN D. WOODSON**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 09 CV 8028** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | **Magistrate Judge Young B. Kim** |
| *Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | **August 27, 2010** |

### MEMORANDUM OPINION and ORDER

Before the court is John Woodson's motion for summary judgment challenging the denial of his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381a, 1382c. Woodson claims that he is disabled by high blood pressure and hypertrophic cardiomyopathy, which cause him to experience severe chest pain, shortness of breath, and fatigue. For the following reasons, Woodson's motion is granted and this case is remanded for further proceedings consistent with this opinion:

### Procedural History

Woodson applied for SSI and DIB in May 2007, claiming that his disability began on September 1, 2002. (A.R. 109, 117.) The Social Security Administration ("SSA") denied his claim initially and on reconsideration. (Id. at 57-60.) Woodson then requested, and was granted, a hearing before an administrative law judge ("ALJ"). (Id. at 21.) The ALJ determined that Woodson is not "disabled" as defined in the Social Security Act and denied

his claims for DIB and SSI. (*Id.* at 19.) When the Appeals Council denied review, (*id.* at 1-3), the ALJ's decision became the final decision of the Commissioner, *see Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Woodson then filed the current suit seeking judicial review of the ALJ's decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

In 1986—when he was 20 years old—Woodson suffered blunt chest trauma while serving in the United States Army at Ft. McCoy, Wisconsin. (A.R. 32, 295-97, 306-07.) He was moving artillery when a 250-pound projectile fell off of a storage rack onto his chest, damaging his sternum and causing a myocardial tear and contusion. (*Id.* at 295, 306-07.) He underwent cardiopulmonary bypass surgery to repair the damage. (*Id.* at 306.) After being discharged from the Army in 1989, he went on to work several jobs, most recently as a housekeeper in a nursing home. (*Id.* at 32-34, 154.) He stopped working in 2002 because, he says, he was experiencing chest pain and dizziness that rendered him disabled. (*Id.* at 33.) At his hearing before the ALJ in June 2008, Woodson offered both documentary and testimonial evidence to support his claims.

### A.    Medical Evidence

Although Woodson claims a disability onset date of September 1, 2002, the first medical evidence in the record—other than that related to the 1986 injury—is from May 2007, the month he first sought disability benefits. (A.R. 139.) On May 3, 2007, Woodson

was interviewed at an SSA field office. (Id. at 135-39.) The interviewer reported that Woodson had no difficulties in sitting, standing, walking, or breathing. (Id. at 138.) The following month, Woodson was examined at the SSA's behest by consultative physician Dr. Jeffrey Ryan. (Id. at 188.) Woodson told Dr. Ryan that he had persistent pain at the site of his 1986 surgery and that he was unable to walk more than 10 steps without becoming short of breath. (Id.) Dr. Ryan reported that Woodson walked into the examination center with his arm around his sister and that he had "great discomfort even in getting around" that was "consistent throughout the examination." (Id. at 189.) Dr. Ryan said that Woodson was "significantly dyspneic"—out of breath, in layman's terms, see STEDMAN'S MEDICAL DICTIONARY 601 (28th ed. 2006)—and "unable to walk more than 15 feet unassisted." (Id.) Dr. Ryan further noted that Woodson could not perform a toe or heel walk, tandem gait, or squat and rise. (Id.) Dr. Ryan diagnosed Woodson as having "significant severe shortness of breath with uncertain cause," noting that the most common explanation would be pulmonary or cardiac. (Id. at 190.)

Three weeks after Dr. Ryan examined Woodson, a medical consultant named Dr. Robert Patey completed a residual functional capacity assessment based on his review of Woodson's medical file. (A.R. 197-204.) Dr. Patey opined that Woodson could sit, stand, or walk for six hours in an eight-hour workday without any postural, manipulative, or environmental limitations. (Id. at 199-201.) In explaining his opinion, Dr. Patey questioned Woodson's credibility. (Id. at 204.) He said that Woodson's complaints of shortness of

breath were not supported by any medical records. (Id.) He noted the contrast between Woodson's presentation to the field interviewer, who said that he had no problem walking or breathing, and Dr. Ryan's observations regarding Woodson's limitations. (Id.) Dr. Patey concluded that Woodson's complaints of chest pain "appear to be non-cardiac in nature" and "out of proportion to his history." (Id.) Dr. Patey said that the record showed that Woodson has hypertension which could warrant a functional limitation, but only to the extent that he should be restricted to lifting and carrying 50 pounds occasionally and 25 pounds frequently. (Id.)

On September 4, 2007, Woodson reported to an emergency room complaining of severe chest pain that followed his attempt to do housework. (A.R. 243.) He was hospitalized for three nights and underwent a cardiac catheterization. (Id. at 209, 211.) He was diagnosed as having untreated hypertension and "moderate to severe asymmetric hypertrophy" with "grade 1 diastolic dysfunction." (Id. at 209.) His condition was also referred to as hypertrophic cardiomyopathy. (Id. at 213.) The hospital report states that while he was hospitalized Woodson had several episodes of severe chest pain even at rest. (Id. at 240.). A cardiologist concluded that his symptoms were "most likely due to uncontrolled hypertension or due to musculoskeletal etiologies." (Id. at 252.)

Shortly after his hospitalization Woodson had a second interview at a Social Security field office, and again the interviewer found him to have no difficulties in sitting, standing, walking, or breathing. (A.R. 162.) In connection with that interview Woodson filled out a

form reporting that his pain, fatigue, and weakness had all increased in the previous few months. (Id. at 165.) He reported having a limited ability to walk, no ability to climb stairs, and needing help dressing. (Id. at 168.)

The most recent treatment records are from May and June 2008. On May 14, 2008, a nurse from the Jesse Brown Veteran Administration Medical Clinic reported that Woodson complained of having chest pain after doing housework two days earlier. (A.R. 285.) He told the nurse he had not had any chest pain or shortness of breath since that episode. (Id.) Progress notes from a June follow-up appointment state that Woodson was asymptomatic (he denied having shortness of breath), but that he had not taken his medications that day "because they make him sleepy." (Id. at 288.) The notes also state that Woodson "[h]as some end organ disease." (Id. at 287.)

### B.    Woodson's Testimony

During the hearing Woodson testified that he can no longer work because he has chronic chest pain, shortness of breath, and fatigue. (A.R. 36, 49.) Woodson described experiencing shortness of breath and fatigue on a daily basis. (Id. at 39, 44.) He said that he can walk for only one or two blocks and can sit or stand for only about an hour before becoming fatigued. (Id. at 36, 44, 48.) He testified that he takes a total of six medications to treat his symptoms, and that the combination of medicine makes him drowsy. (Id. at 38-39.) Woodson said that after he takes his medicine he falls asleep for two to four hours. (Id. at 39.) He explained that he had not taken his medicine the morning of the hearing because

he wanted to be alert. (Id. at 39-40.) Woodson said that he told his doctor that the medicine was making him tired, but the doctor said "there's nothing that he can do about it." (Id. at 40.) In fact, Woodson said the doctor told him that after he takes his pills he should "just go to sleep because there's nothing you can do, because it's going to make you sleepy regardless." (Id.)

Woodson testified that he has episodes of severe chest pain up to three times each week, with each episode lasting 30 to 45 minutes. (A.R. 41.) He said that exertion, especially walking, triggers his chest pain. (Id. at 42.) Woodson testified that his most recent episode happened two days before the hearing, when he was emptying the garbage outside. (Id. at 40-41.) He described his chest pain as a "sharp, bumping sensation" from his neck down to his stomach. (Id. at 41.) Woodson said that he takes nitroglycerin pills to reduce the chest pain, but the medicine does not resolve his pain completely. (Id. at 42-43.) He explained that with each episode of chest pain he feels dizzy and has double vision. (Id. at 43-44.) Woodson testified that lately he had experienced chest pain almost every day, even while sitting down. (Id. at 49.)

## C.    Medical Expert's Testimony

The ALJ called Dr. Donald Chariss, an internist, to testify as a medical expert. (A.R. 51, 105.) Based on his examination of the medical record, Dr. Chariss testified that Woodson

has hypertension and "possibly angina."[1]  (Id. at 51.)  He explained that he was unsure

whether Woodson's chest pain should be diagnosed as angina because it could be "secondary

to uncontrolled hypertension" or have a "musculoskeletal etiology." (Id. at 51.) Dr. Chariss

said that Woodson had a "perfectly normal coronary angiogram" in 2007 and opined that his

diastolic dysfunction was probably caused by his uncontrolled high blood pressure.  (Id.)  As

for Woodson's fatigue, Dr. Chariss testified that the only prescribed medication that would

cause drowsiness is metoprolol.  (Id. at 52.)  Dr. Chariss commented that if Woodson's

medication were causing the described level of fatigue, he could not "understand why the

doctors don't change his medication, because they can."  (Id.)  In fact, he said, metoprolol

"can be easily substituted to something else." (Id. at 53.) Dr. Chariss opined that Woodson's

impairments would limit him to work that is "somewhere between sedentary and light." (Id.

at 54.)

### D.    ALJ's Decision

After considering the proffered evidence, the ALJ concluded that Woodson is not

disabled.  In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R.

§ 404.1520, which requires her to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant
> has a severe impairment; (3) whether the claimant's impairment meets or
> equals one of the impairments listed by the [Commissioner], *see* 20
> C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform his past

---

[1]  Angina is the medical term for severe chest pain.  *See* Stedman's Medical Dictionary
85 (28th ed. 2006).

work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If at step three of this framework the ALJ finds that the claimant has a severe impairment which does not meet the listings, she must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the residual functional capacity ("RFC") to determine at steps four and five whether the claimant can return to his past work or to different available work. *Id.* § 404.1520(f), (g).

Here, the ALJ found at step one that Woodson had not engaged in substantial gainful activity since September 1, 2002. (A.R. 16.) At step two the ALJ determined that Woodson has severe impairments consisting of hypertension and "chest pain with possible anginal component."[2] (Id.) At step three the ALJ determined that none of Woodson's impairments meet or medically equal the listings, noting that "[t]he evidence does not suggest that the claimant's hypertension has caused end organ damage." (Id.)

Turning to step four, the ALJ determined that Woodson has the RFC to perform the full range of sedentary work as defined by the social security regulations. (A.R. 17.) In making that determination, the ALJ said that she gave greater weight to the opinion of

---

[2] The ALJ noted that Woodson had not submitted any evidence showing that he experienced symptoms or received treatment prior to June 9, 2007. Accordingly, she determined that he had no medically determinable impairments before that date. (A.R. 16.)

Dr. Chariss than to that of Dr. Patey, the state agency medical consultant. (Id. at 18.) The ALJ found Woodson less than credible, stating that his "presentation and allegations have changed while the claim has been pending." (Id. at 17.) She noted that even when Woodson did not take his medication his condition "has remained relatively stable" and that he only complained to his doctors about chest pain after engaging in "heavy exertion." (Id.) The ALJ said that Woodson had "changed the emphasis of his complaints" at the hearing to focus on the fatigue caused by his medications. (Id. at 18.) The ALJ highlighted Woodson's testimony that his doctor had told him to go to sleep when he felt drowsy, and concluded that "it is more likely that [Woodson] has not fully addressed the issue with his doctors because it is not as much of a problem as he testified." (Id.) The ALJ further concluded that Woodson's fatigue would not prevent him from performing sedentary work." (Id.) After concluding that Woodson could not perform any of his previous jobs, at step five the ALJ applied Medical-Vocational rule 201.27, *see* 20 C.F.R. § 404, Subpt. P, App. 2, to find that he is not disabled. (Id. at 19.)

## Analysis

In the current motion for summary judgment, Woodson argues that the ALJ ignored evidence that was favorable to his claim and engaged in an improper credibility analysis. Specifically, he argues that the ALJ selectively discussed the medical evidence regarding his 2007 hospitalization and improperly discounted Dr. Ryan's descriptions of the limiting effects of Woodson's condition. Woodson also argues that the ALJ failed to apply the

credibility factors set forth in the social security regulations and gave reasons for her credibility determination that are unsupported by the evidence. In response, the Commissioner argues that any error in the ALJ's review of the evidence was harmless and that the credibility determination is sufficiently supported to withstand judicial review.

This court reviews the Commissioner's decision to ensure that it is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). Although it is not this court's role to "nitpick" the ALJ's reasoning, *see Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), this court will reverse where the ALJ's explanations lack record support, are based on legal error, or are articulated so poorly that meaningful review is impossible, *see Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009).

Woodson's strongest argument is that the ALJ made several errors in assessing his credibility. Specifically, he argues that the ALJ failed to consider several of the factors set forth in SSR 96-7p, 1996 WL 374186, relied on mistakes of fact, and made unsupported assumptions in finding him not credible. Because the ALJ is in the best position to assess a witness's honesty, credibility determinations are given "special deference" and will be affirmed unless "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). But the court gives less deference where "the determination rests on 'objective factors or

fundamental implausibilities rather than subjective considerations.'" *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (quoting *Clifford*, 227 F.3d at 872).  The ALJ must explain the credibility evaluation with specific reasons that are supported by the record, *see Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003), and must "build a logical bridge between the evidence" and her conclusion, *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Here the ALJ stated that Woodson's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." (A.R. 17.)  But in the discussion ensuing "below," the ALJ never addresses Woodson's descriptions of the limiting effects of his impairments beyond his complaints of fatigue.  As Woodson points out, SSR 96-7p requires an ALJ to take a number of factors into account in assessing a claimant's credibility, including the claimant's descriptions of his symptoms, any measures he uses to treat those symptoms, and his daily activities.  1996 WL 374186, at *5.  Woodson testified that he has difficulty walking more than a couple of blocks, that he has to lie down for much of the day, and that he can only do minor chores and even then only when spaced out in small segments so he does not become fatigued.  (A.R. 47-48.)  His testimony finds support in Dr. Ryan's observations regarding his shortness of breath and difficulty walking even 15 feet, yet the ALJ did not address those statements, let alone explain why she found them not credible.  Moreover, the ALJ's conclusory statement that she rejected Woodson's

descriptions of his symptoms "to the extent they are inconsistent with the residual functional capacity assessment" raises the concern that she discounted his credibility simply because his testimony did not mesh with her view of his RFC. As the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that do not "turns the credibility determination process on its head." *Brindisi*, 315 F.3d at 787-88. The ALJ is required to assess a claimant's credibility *before* developing the RFC. *Id.* at 788. Given the ALJ's failure to analyze Woodson's testimony regarding his symptoms and daily activities, this court cannot be sure that she evaluated his credibility independently rather than dismissing his testimony to the extent that it did not fit neatly within her RFC assessment. *See id.*

Woodson also persuasively argues that the ALJ misstated the record and engaged in impermissible speculation in rejecting his complaints of fatigue. The ALJ faulted Woodson for what she called the change in emphasis of his complaints from chest pain and shortness of breath in his initial applications, to fatigue caused by his hypertension medication at the hearing. (A.R. 18.) But Woodson complained of fatigue in disability reports he submitted in June and September 2007, and again to his treating physician in 2008. (Id. at 149-50, 165, 288.) More importantly, Dr. Chariss testified that Woodson's hypertension medication, metoprolol, could cause him to experience fatigue. (Id. at 52.) In June 2007 Dr. Ryan reported that Woodson was not taking any medication. (Id. at 189.) In fact, the record shows that Woodson's hypertension was uncontrolled as late as his September 2007 stay at Stroger

Hospital. (Id. at 252.) Following that hospitalization, Woodson reported that his doctor at Stroger had prescribed metoprolol. (Id. at 167.) After he started taking metoprolol, Woodson's treating physician noted that his medication was making him sleepy. (Id. at 288.) Thus the "change in emphasis" in Woodson's complaints of fatigue—to the extent there was one—is consistent with the timing of the new prescription for metoprolol, a medication that the medical expert testified could cause fatigue. (Id. at 52.) The ALJ ignored that evidence and assumed that the change in emphasis meant Woodson was exaggerating his fatigue, concluding that "it is more likely" that Woodson did not describe the same level of fatigue to his doctor. (Id. at 18.) But that comment reflects nothing more than the ALJ's speculation. That there are non-drowsy alternatives to a medication does not mean that the alternative is available to Woodson. There could be any number of reasons why a doctor would not substitute a drug, from insurance coverage issues to the compatibility of the alternative with the patient's other treatments. Instead of exploring that background with Woodson or the medical expert, or recontacting Woodson's physician for an explanation, the ALJ assumed Woodson was lying. Credibility determinations based on ALJ conjecture cannot withstand judicial review. *See Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007); *Blakes on behalf of Wolfe v. Barnhart*, 331 F.3d 565, 569-70 (7th Cir. 2003); *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) (noting that speculation is "no substitute for evidence").

The Commissioner defends the ALJ's credibility determination in part by highlighting the discrepancy between Woodson's presentation to the Agency interviewers—who observed no abnormalities in his walking, standing, or breathing—and his presentation to Dr. Ryan—who reported that Woodson was unable to walk more than 15 feet without help. The Commissioner points out that Dr. Patey, the consulting physician, discounted Woodson's credibility based on that discrepancy. Those are good points, and reasons that might have provided a solid basis for an adverse credibility finding had the ALJ discussed them. But the ALJ did not discuss that discrepancy or cite it as a reason to mistrust Woodson; instead, she focused on the perceived shift in his complaints from pain and shortness of breath to fatigue. This court is limited to reviewing the reasons that appear in the ALJ's decision and cannot affirm based on reasons that the ALJ could have given but didn't. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Larson v. Astrue*, __ F.3d __, 2010 WL 3001209, at *5 (7th Cir. Aug. 3, 2010). Accordingly, the discrepancy the Commissioner partly relies on cannot be used here.

Less persuasive is Woodson's argument that the ALJ improperly ignored, misinterpreted, and misstated medical evidence that supports his claims. In particular, Woodson faults the ALJ for omitting any discussion of the observations reported by the consulting examiner, Dr. Ryan, who described Woodson as having difficulty walking even 15 feet without assistance, as experiencing significant shortness of breath during the examination, and of having "great discomfort even in getting around." (A.R. 189.) The ALJ

did not address those observations explicitly, instead summarizing Dr. Ryan's report as follows:

> When [Woodson] was seen by the consultative examiner in June 2007 the claimant appeared dyspneic and in a good deal of pain but findings on examination were relatively mild. The examiner heard crackles, suggesting a cardiac issue, but there were no other findings showing congestive heart failure and his chest x-ray was negative. Pulmonary function testing revealed only a mild restriction, pre-broncodilation."

(Id. at 17.) The Commissioner asserts that this passage is an "accurate summary" of Dr. Ryan's findings and argues that the ALJ was not required to mention every detail of Dr. Ryan's report in explaining her decision. (R. 22, Def.'s Resp. at 8.)

Although Woodson is correct that an ALJ may not ignore a whole line of evidence that favors the claimant, it is equally true that the ALJ need not mention every detail of the medical record that supports the claimant. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Under the substantial evidence standard, this court's job in reviewing the ALJ's decision is to ensure that the ALJ considered the relevant medical evidence and reached a logical conclusion that is supported by the record. *Id.*; *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Here, while the ALJ may have described Dr. Ryan's observations in broad strokes, she did not ignore them. She acknowledged Dr. Ryan's observations of Woodson's shortness of breath and difficulty walking when she highlighted his report that Woodson was "dyspneic and in a good deal of pain." Nor did the ALJ state—as Woodson argues here—that she rejected his observations because Dr. Ryan could not determine their origin. Rather, the ALJ reasonably weighed Dr. Ryan's observations against his other medical

findings in evaluating Woodson's condition. Significantly, Dr. Ryan did not provide an opinion as to what functional limitations result from Woodson's condition nor did he provide any opinion that contradicts the ALJ's conclusion that Woodson can perform sedentary work. Woodson's argument essentially boils down to his belief that the ALJ should have placed more weight on Dr. Ryan's observations than on his other findings, but it is not this court's role at this phase to re-weigh the evidence. *See Powers*, 207 F.3d at 434-35. Because the ALJ's decision assures the court that the ALJ considered Dr. Ryan's observations along with the other objective medical evidence, her decision not to describe those observations in detail or ascribe to them the weight Woodson prefers does not amount to reversible error.

Woodson also argues that the ALJ misinterpreted the medical evidence stemming from his 2007 hospitalization. He bases this argument on the ALJ's notation that testing during his hospitalization "revealed moderate to severe asymmetric hypertrophy with grade I diastolic dysfunction, but his ejection fraction and systolic function were normal." (A.R. 17.) Woodson cites studies showing that normal ejection fraction and systolic function can be consistent with hypertrophic cardiomyopathy, and argues that the "but" in the ALJ's sentence shows that she misunderstood his medical condition. Woodson makes too much of the ALJ's sentence construction and asks this court to engage in the kind of nitpicking that the substantial evidence standard prohibits. *See Shramek*, 226 F.3d at 811. The ALJ did not say that she discounted the evidence of his cardiomyopathy because of the normal ejection fraction and systolic function results or otherwise held those results against him. On the

contrary, the ALJ simply gave an accurate recitation of the results of Woodson's echocardiogram, and nothing in her decision demonstrates that she placed undue weight (or any weight, really), on the ejection fraction and systolic function results.

More troubling is the ALJ's comment that the record "does not suggest that the claimant's hypertension has caused end organ damage." (A.R. 16.) As Woodson points out, his treating physician noted in June 2008 that his hypertension *has* caused "some end organ disease." (Id. at 287.) The ALJ's comment likely reflects an oversight, and one that this court might disregard in other circumstances, but coupled with the errors in the credibility determination, it raises doubts regarding whether the ALJ adequately reviewed the most recent medical evidence. *See, e.g., Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). Accordingly, the comment adds another thumb on the scale weighing toward a remand. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003).

This court recognizes that this is a close case—as Dr. Patey pointed out, there certainly is record evidence that could support a finding that Woodson's claims lack credibility. But given Woodson's 2007 hospitalization, Dr. Ryan's observations regarding the limiting effects of his condition, and the objective evidence showing that Woodson has hypertrophic cardiomyopathy which could cause the symptoms he describes, his claims are not frivolous, and accordingly this court cannot overlook the ALJ's mistakes on the basis of harmless error. *See Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006); *Sarchet v. Barnhart*, 78 F.3d 305, 309 (7th Cir. 1996).

On remand, the ALJ should reevaluate Woodson's credibility in light of the concerns highlighted above.

## Conclusion

For the foregoing reasons, Woodson's motion for summary judgment is granted and the case is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**